UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
STERLING ROBINSON,

                Petitioner,

   -against-                             **MEMORANDUM & ORDER**
                                                11-CV-4454 (PKC)

NEW YORK STATE DIVISION OF PAROLE,

                Respondent.
-----------------------------------------------------------X
PAMELA K. CHEN, United States District Judge:

Petitioner Sterling Robinson ("Petitioner" or "Robinson"), appearing *pro se*, petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his conviction entered on July 19, 2007 in the Supreme Court of the State of New York, Kings County. For the reasons set forth below, the petition is denied in its entirety.

## BACKGROUND

**I.    Relevant Facts**

On April 9, 2006, at approximately 5:30 p.m., there was a two-car collision at an intersection in Brooklyn, New York. When Emergency Medical Service ("EMS") technicians arrived, they found Petitioner "on the driver's side" of his 2005 Ford Mustang, "hanging halfway out of the vehicle on his back" and "complaining of pain." (T. 26-27.)[1] An EMS technician smelled "alcohol on [Petitioner's] breath" and informed Officer Anson Lancaster of the New York City Police Department ("NYPD"), who was one of the responding officers to the scene, of his observation. (T. 29.) Petitioner was transported to a nearby hospital and, at some point, was placed

---

[1] "T." refers to the transcript of Petitioner's trial from June 20, 2007 to June 26, 2007. (Dkt. 7-1.)

under arrest for Driving While Intoxicated. (T. 78, 82-93.) The car Petitioner was driving, which was later determined to be registered to him, was towed and vouchered as "arrest evidence". (T. 57, 70.) The NYPD subsequently performed an inventory search of the vehicle and found a loaded nine-millimeter Luger handgun and fifty rounds of ammunition in the trunk. (T. 66.)

Petitioner was indicted on charges of Criminal Possession of a Weapon in the Third Degree, Criminal Possession of a Weapon in the Fourth Degree, Operating a Motor Vehicle While Under the Influence of Alcohol, Operating a Motor Vehicle While Impaired, Unlawful Possession of Ammunition, and Failure to Comply with a Traffic Control Device.

## II. Procedural History

### A. Suppression Hearing

Before trial, Petitioner moved to suppress the gun and ammunition that had been recovered from the trunk of his car. State court Justice Gustin Reichbach held a *Mapp/Dunaway* hearing[2] on April 11, 2007 and April 20, 2007. Officer Lancaster testified that on April 9, 2006, he and his partner responded to a "911 call for an accident." (H. 9.)[3] Lancaster spoke to Cassandra Morris, the driver of the other car, and she said that Petitioner's vehicle ran the stop sign and hit her. (H. 10-11.) She pointed out the driver of the other vehicle, who was "[l]aying next to . . . his vehicle" with his legs "partially still inside the vehicle. Petitioner was later identified as the driver. The rest of his body was outside the vehicle." (H. 11, 13-14.) The EMS technicians on the scene told Lancaster that "they thought [Petitioner] was intoxicated." (H. 12.) Lancaster then independently determined that Petitioner "had a strong smell of alcohol on his person", concluded that Petitioner

---

[2] A *Mapp/Dunaway* hearing is a motion to suppress physical evidence obtained during an arrest.

[3] "H." refers to the transcript of Petitioner's *Mapp/Dunaway* hearing on April 11, 2007 and April 20, 2007. (Dkt. 7-1.)

2

was intoxicated, and placed Petitioner under arrest. (H. 16, 23.) Lancaster did not speak with Petitioner at the scene of the accident because Petitioner was "incoherent at the time" and "[n]ot able to answer any questions." (H. 14, 23.)[4] Petitioner was then taken to Kings County Hospital in Brooklyn. (H. 16.) At around 8:50 p.m. that night, NYPD Highway Officer Gene Sheyn arrived at the hospital and asked Petitioner if he would consent to a blood alcohol test "to determine if [he] [was] or [was]n't DWI [*i.e.*, driving while intoxicated]." (H. 17, 27-28.) Petitioner refused to give his consent. (H. 17.)

Petitioner's vehicle was "vouchered as arrest evidence" and taken to the car pound at the 63rd Precinct. (H. 17-18.) Pursuant to standard NYPD procedure, an inventory search was conducted to ensure "safekeeping of the defendant's property . . . to protect him, the police and the public." (H. 18.) Most of the items found in Petitioner's vehicle were personal property, which was returned to his family, but Lancaster also recovered a "loaded" "[n]ine-millimeter Ruger from a blue bag . . . in the trunk of the vehicle", as well as "[a] box of [various] ammo", including hollow point and regular nine-millimeter bullets, and a second magazine. (H. 20.) The gun had a "[l]oaded magazine and one [bullet] in the chamber." (H. 21-22.)

Petitioner did not put on any witnesses at the hearing. His attorney instead argued that "there are common law standards for judging intoxication which involve[] more than just the significance of odor on the breath. It's always been the descriptive quality of somebody that's intoxicated." (H. 30-31, 40.) At the conclusion of the hearing, the court held that

> I think for probable cause there is more than sufficient evidence for the People to have reasonably believed the defendant was intoxicated and as a result was involved in an accident. . . . Officer Lancaster [testified] that he arrived at the scene

---

[4] Lancaster concluded that Petitioner was "incoherent" because "EMS was asking him questions and he wasn't able to answer." (H. 17, 21.) Lancaster stated that he was standing "right next to" Petitioner at the time, and Petitioner "appeared semiconscious". (H. 24, 26.)

3

of the accident, was informed by EMS that they thought the defendant was intoxicated. He was laying [sic] next to the car unable and incoherent to respond to EMS questions and it was a strong smell of alcohol on his person. All of that the Court determines taken together was sufficient to give the officer's probable cause to arrest the defendant. . . . It was proper for the police to voucher the car and subsequently a proper inventory search yielded the loaded firearm from the bag in the trunk. Based on that, the Court finds that the People have sustained this burden. Motion to suppress is denied.

(H. 41-43.)

### B. Trial

Petitioner's trial was held from June 20, 2007 to June 26, 2007 before State court Justice Cheryl Chambers. Morris testified that on April 9, 2006, a 2005 Ford Mustang "came colliding into me, flew past the stop sign" and struck her car in the middle of the intersection. (T. 88.) She stated that the Mustang hit "the front end" of her car and the "whole bumper [came] off." (*Id.*) The Mustang then "hit the parked vehicle on the corner, jumped the sidewalk, and . . . was halfway hanging off the sidewalk." (T. 89.) She stated that after the accident, the body of the driver, later identified as Petitioner, was "halfway hanging out" of his car's driver's side, and that Petitioner was "bent over", "facing down", and "shaking". (T. 97.) Morris sustained head and neck injuries as a result of the accident. (T. 93.)

Peter Bojmal, an EMS technician with the Flatlands Volunteer Ambulance Service, also testified for the prosecution. He explained that he arrived on the scene minutes after the accident and went to help Petitioner, who was "complaining of pain." (T. 27.) Bojmal "asked him what was wrong, what was bothering him, if he had . . . any pain at that point in time. [Petitioner] responded with slurred speech", but was conscious. (T. 28, 36, 38.) Petitioner was "[i]n extreme pain" with "bumps and bruises." (T. 29.) Bojmal worked on Petitioner for fifteen minutes—administering oxygen (T. 39)—and testified that there was "alcohol on [Petitioner's] breath" "[d]uring the entire 15 minutes" (T. 29-30, 43). Bojmal told Officer Lancaster about his

4

observations and also put them in his hospital care report, which was completed contemporaneously with the accident and later introduced into evidence at trial. (T. 29-34.) Bojmal saw police officers attempting to talk to Petitioner, but Petitioner did not respond. (T. 37.) Bojmal then drove Petitioner to the hospital. (T. 35.)

Officer Lancaster's testimony at trial was somewhat convoluted with respect to his observations of Petitioner. At trial, he stated at one point that he tried to speak to Petitioner at the scene and ask him his name and what happened, but Petitioner "was incoherent at the time" and "unresponsive". (T. 57, 61-62, 73.) Later, however, Lancaster testified that he "didn't get close enough to [Petitioner] at the car to make [a] determination" about whether Petitioner was conscious or unconscious at the scene. (T. 73-74.) Similarly, Lancaster testified that he got into the ambulance with Petitioner because Petitioner "had a smell of alcohol on his breath." (T. 56, 58.) But later in his testimony, he stated that he did not place Petitioner under arrest for driving while intoxicated until after they arrived at the hospital because that was the first time "when I smelled, personally smelled alcohol on his breath." (T. 78, 82-83.) Lancaster then testified about finding the firearm during the inventory search. (T. 57, 67-68, 70.) Finally, he stated that while he saw the hospital staff take Petitioner's blood "[m]aybe half an hour" after Petitioner's arrival at the hospital, Lancaster did not see anyone give Petitioner any medication. (H. 74-75.)

Officer Sheyn testified about arriving at the hospital at 8:25 p.m. where he observed Petitioner in a "semi-unconscious state". (T. 105.) Sheyn described Petitioner as "in and out. He was falling asleep, and he was waking up." (*Id.*) Sheyn asked Petitioner a series of "standardized questions", which Sheyn felt that Petitioner understood. (T. 105-06.) Sheyn then asked Petitioner whether he would be "willing to consent to a blood test" (T. 106) and then advised Petitioner:

> Refusal to submit to a chemical test or any portion thereof will result in the immediate suspension and subsequent revocation of your license or operating

privilege whether or not you are found guilty of the charge for which you have been arrested[,] for which you are arrested—excuse me—your refusal to submit to a chemical test or any portion thereof can be introduced into evidence against you at any trial proceeding or hearing resulting from this arrest. After receiving this warning, the operator was asked to submit to a chemical test.

(T. 109-110 (Sheyn gave warnings from Report of Refusal to Submit to a Chemical Test).) In response to the warning, Petitioner "stated yes. Then he changed his mind. He said no twice. And he was not willing to sign the consent form, which comes in the blood kit, which has to be signed by the person consenting to give the blood, to do the blood test." (T. 118; *see also* T. 110.) Additionally, Sheyn testified that after observing Petitioner for a period of time, Sheyn noticed "a strong odor of alcoholic beverage on [Petitioner's] breath. He had a bloodshot, watery eyes. And he was in semi-unconscious state. And he was unable to concentrate on verbal commands that were given to him." (T. 111.)

Following the close of its case, the prosecution moved Petitioner's hospital medical records into evidence as business records (T. 122-23). The medical records showed, *inter alia*, the presence of alcohol in Petitioner's blood immediately after the accident. (Dkt. 17-1, at ECF 70.)[5] The trial judge also read a stipulation into the record as to the operability of the firearm. (T. 124.)

Petitioner chose to testify in the defense case. He stated that he did not drink before driving (T. 159) and that he "do[es] not drink alcohol" (T. 164). He testified that immediately before the accident, he was visiting his aunt's house, and when he was leaving he

> noticed that near the back tire of my car there was a black plastic bag. . . . So when I picked up the bag, I noticed it was really heavy. And then I looked in the bag and saw that it was a weapon, and the ammunition was in the bag. From that point, I noticed that . . . there were kids and stuff playing in the area. So instead of me just putting the bag back there, I put it in my trunk, and I was going to proceed and take it to the precinct, the 63rd precinct.

---

[5] Citations to "ECF" pages refer to the page numbering of the Electronic Court Filing ("ECF") system, and not the document's internal page numbers.

(T. 159-160.) He stated that, on the way to the precinct, he stopped at the stop sign and then "proceeded to go into the intersection and . . . I was going to make a left turn. And at that point I just noticed that my head was going into the steering wheel at that point. I don't recall too much more." (T. 161, 173.) He did not remember falling out of his car, and only "vaguely remember[ed]" being in the ambulance and "someone asking [him] questions". (T. 161-62.) However, he testified that he was conscious at the hospital and that "the officers [Sheyn and Lancaster] . . . grabbed me and told me I was under arrest, and they kind of roughed me up at the hospital." (T. 163, 179; *see also* T. 180-81.) Petitioner said he was "trying to figure out why [they] were] all arresting me. That is about it. And they were telling me I had a gun. I told them I found the gun. And they were like: No, you had a gun, and we are going to arrest you for having a gun." (T. 163.) Additionally, Petitioner said he did not recall being asked if they could take blood or being told the consequences if he refused because "I was feeling, I was feeling pain, you know something, because I was blacking in and out. I mean, I can't—I don't really recall a lot. I know I was feeling pain. I was just hurting from my neck, my back." (T. 163-64.) He also claimed that at the hospital, "[t]hey were injecting me with all kind[s] of stuff. There was a nurse. She was injecting me with some stuff. I don't know what it was." (T. 162.)

Two of Petitioner's acquaintances also testified in the defense case. The first, Robert Hoagland, testified that he had known Petitioner for twelve years and that he was "a very upstanding person" who did not drink. (T. 126, 128.) The second, Kenneth Howze, witnessed the accident. He was standing on the corner of the intersection when he saw Petitioner's car stop at the stop sign, "proceed forward[,] and just get hit." (T. 133, 135.) According to Howze, the police arrived before EMS and were trying to talk to Petitioner, who was basically "unconscious". Howze described Petitioner as "shaking" and not "really responding to [EMS]". (T. 135-36.) Howze

7

further testified that he saw "from the force of the impact, the car trunk must have been open, and . . . me and another witness, Howard,[6] was observing the police going through his trunk, the trunk of the car." (T. 136.) Howze said that the police "took out something [from the trunk] in a plastic bag, and one handed it to his partner. And then that same officer who went through the trunk got into the back of the ambulance with [Petitioner]." (T. 137.)

On June 26, 2007, the jury found Petitioner guilty of Criminal Possession of a Weapon in the Third Degree and Operating a Motor Vehicle While Under the Influence of Alcohol or Drugs. (T. 275-76.) On July 19, 2007, the court sentenced Petitioner to concurrent prison terms of two years on the weapon possession count and one year on the driving while under the influence count, and three years of post-release supervision. (Dkt. 7-1.)

**C. Direct Appeal**

In November 2009, Petitioner appealed his conviction to the New York State Appellate Division, Second Department. In his counseled brief, he argued that (1) he received ineffective assistance of counsel, (2) the prosecutor's summation violated his right to due process, and (3) the prosecution violated New York Vehicle and Traffic Law § 1194(2)(a)(1) by introducing evidence that Petitioner had refused to submit to a chemical blood test. (Dkt. 7-2, Ex. B.) In August 2010, Petitioner filed a *pro se* supplemental brief arguing that the arresting officer's search of his car violated his Fourth Amendment rights because the arresting officer searched areas of the car that extended beyond the reasonable scope of an inventory search and because the arresting officer failed to catalogue the contents of the car. (Dkt. 7-2, Ex. E.)

On February 19, 2011, the Appellate Division affirmed Petitioner's judgment of conviction. *People v. Robinson*, 82 A.D.3d 1269 (2d Dep't 2011). The court held that the

---

[6] Howard did not testify at the trial.

prosecution had not violated the Vehicle and Traffic Law, that Petitioner "was not deprived of the effective assistance of counsel," and that Petitioner's "contention that various comments made by the prosecutor during his summation were improper and deprived him of a fair trial" was unpreserved for appellate review. *Id*. at 1270.

The Court of Appeals denied Petitioner's leave to appeal on June 27, 2011. *People v. Robinson*, 17 N.Y.3d 800 (2011).

### D. Motion to Vacate

On June 30, 2010, Petitioner, proceeding *pro se,* moved, in the Supreme Court, Kings County, to vacate his judgment of conviction pursuant to New York Criminal Procedure Law § 440.10. (Dkt. 7-2, Ex. H.) He argued that (1) the search of his car was unlawful, (2) he was improperly denied a pretrial suppression hearing, (3) the hospital took his blood without his consent, and (4) expert testimony should have been introduced at trial to explain the blood samples mentioned in the hospital records that were admitted into evidence. On November 12, 2010, the court denied Petitioner's motion. (Dkt. 7-2, Ex. J.) The court found that, with the exception of Petitioner's claim of being "violently restrained", the remaining claims were procedurally barred because Petitioner's direct appeal was still pending and sufficient facts appeared on the record to permit review of those claims on appeal. (*Id.* at 2-3.) With respect to the merits of his restraint claim, the court found that Petitioner's "bare assertion that he had been 'violently restrained' by police officers is unsubstantiated, made solely by Defendant, and under these circumstances there is no reasonable possibility that the allegation is true." (*Id.* at 3.)

### E. Instant *Habeas* Petition

Petitioner timely filed the instant *habeas* petition on September 8, 2011. (Dkt. 1.) Respondent initially responded to the Court's Order to Show Cause on October 16, 2012. (Dkt.

7.) On January 27, 2014, the Court stayed the case so that Petitioner could exhaust his state court remedies. The stay was lifted on February 20, 2015, and Respondent filed a supplemental Order to Show Cause. (Dkt. 17.)

Liberally construing Petitioner's petition, he challenges his conviction on the grounds that: (1) the police violated his *Miranda* rights; (2) the hospital staff conducted an unlawful search by withdrawing blood from Petitioner without his consent; (3) his arrest was unlawful; (4) his trial counsel was ineffective; (5) the arresting officer committed perjury and falsified government documents; (6) the prosecutor engaged in misconduct at the trial; and (7) the police unlawfully searched the trunk of his car.

## STANDARD OF REVIEW

Section 2254 provides that a *habeas corpus* application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks and citation omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker,* 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" Supreme Court cases, or it "confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Penry v. Johnson,* 532 U.S. 782, 792 (2001) (citation omitted).

A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (citation omitted). AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams v. Taylor,* 529 U.S. 362, 411 (2000)). The Second Circuit has added that, while "[s]ome increment of incorrectness beyond error is required[,] . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir. 2006)).

## DISCUSSION

I.   **Petitioner's Claims Relating to Blood Tests Taken at the Hospital[7]**

Petitioner argues that his *Miranda* rights were violated because a nurse at the hospital took blood from him, despite the fact that he "asserted that he would remain silent and wanted legal representation", and that the illegally obtained blood test results were included in the medical

---

[7] These claims encompass Petitioner's first two arguments, *i.e.*, that the police violated his *Miranda* rights and that the hospital staff conducted an unlawful search by taking a blood sample.

11

records given to the jury. (Dkt. 1 at 5.) Even assuming that Petitioner could argue that the nurse was somehow acting as an agent of the police, rather than as a medical professional,[8] in taking a blood sample, Petitioner's claim fails. As the Supreme Court explained in *S. Dakota v. Neville*, 459 U.S. 553 (1983):

> [In *Schmerber v. California*, the Court] upheld a state-compelled blood test against a claim that it infringed the Fifth Amendment right against self-incrimination, made applicable to the States through the Fourteenth Amendment. [The Court] recognized that a coerced blood test infringed to some degree the "inviolability of the human personality" and the "requirement that the State procure the evidence against an accused by its own independent labors," but noted the privilege has never been given the full scope suggested by the values it helps to protect. . . . Since a blood test was "physical or real" evidence rather than testimonial evidence, [the Court] found it unprotected by the Fifth Amendment privilege. . . . *Schmerber,* then, clearly allows a State to force a person suspected of driving while intoxicated to submit to a blood alcohol test.

*Id*. at 559 (quoting *Schmerber v. California*, 384 U.S. 757, 762 (1966)); *see also Sierra v. Bradt*, No. 12-CV-0531 (MAT), 2013 WL 5701805, *7 (Oct. 18, 2013). *Schmerber* "also rejected arguments that the coerced blood test violated the right to due process, the right to counsel, and the prohibition against unreasonable searches and seizures" and, therefore, Petitioner's claims on those grounds fail as well. *Neville*, 459 U.S. at 559. To the extent that Petitioner is arguing that evidence of his refusal to take the blood alcohol test was improperly introduced at trial, his claim also fails. *Id.* at 564 ("We hold, therefore, that a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination.").

---

[8] *Walter v. United States*, 447 U.S. 649, 656 (1980) ("It has, of course, been settled . . . that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and that such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully.").

12

While "*Schmerber* did caution that due process concerns could be involved if the police initiated physical violence while administering the test . . . or responded to resistance with inappropriate force," *Id.* at 560 n.9 (citing *Schmerber*, 384 U.S. at 760 n. 4), Petitioner's claims that the officers were violent are "[m]ere conclusory allegations" that "will not suffice" on federal *habeas* review, *U.S. ex rel. Headley v. Mancusi*, 392 F. Supp. 187, 195 (S.D.N.Y. 1974); *U.S. ex rel. Cummings v. McMann*, 429 F.2d 1295, 1296 (2d Cir. 1970).

Because these claims fail as a matter of law, any related ineffective assistance of counsel claims fail as well. (*See* Dkt. 1 at 7-8.)

## II. Arrest and Inventory Search

Petitioner's claims that he was unlawfully arrested and that, therefore, the police unlawfully searched his car are not cognizable on federal *habeas* review and must be dismissed. *See Montalvo v. Annetts*, No. 02-CV-1056 (LAK)(AJP), 2003 WL 22962504, at *16 (S.D.N.Y. Dec. 17, 2003) ("[Petitioner's] claim that the police lacked probable cause to arrest him, and thus that his statements, seized property, and line-up identifications are fruits of that unlawful arrest, is a Fourth Amendment claim that is not cognizable on *habeas* review.") (collecting cases).

## III. Prosecutorial Misconduct and Perjury by Arresting Officer

Next, Petitioner argues that Officer Lancaster committed perjury, omitted material information, and falsified government documents, and that the prosecutor similarly committed misconduct by introducing misleading and false evidence. (Dkt. 1 at 9-14.) These claims must fail, because "[m]ere conclusory allegations . . . will not suffice" on federal *habeas* review, *Mancusi*, 392 F. Supp. at 195; *McMann*, 429 F.2d at 1296. To the extent Petitioner cites to the trial transcript and accompanying exhibits, they do not support his claim. Furthermore, any discrepancies in Lancaster's testimony between the suppression hearing and trial do not meet the

standard for establishing perjury. *United States v. Josephberg*, 562 F.3d 478, 494-95 (2d Cir. 2009) ("Differences in recollection do not constitute perjury. It is the task of the jury as the appropriate arbiter of the truth to sift[] falsehoods from facts and determine whether an inconsistency in a witness's testimony represents intentionally false testimony or instead has innocent provenance such as confusion, mistake, or faulty memory.") (citation and internal quotations marks omitted).

## IV.    Ineffective Assistance of Counsel

Finally, Petitioner makes a number of ineffective assistance of counsel claims. (Dkt. 1 at 6-8, 12.) Under the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), to establish ineffective assistance of counsel, a *habeas* petitioner must "(1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." *Carrion v. Smith,* 549 F.3d 583, 588 (2d Cir. 2008) (quoting *United States v. Cohen,* 427 F.3d 164, 167 (2d Cir. 2005)) (internal quotation marks omitted).

Even assuming *arguendo* that Petitioner could meet the first prong of *Strickland*, Petitioner cannot demonstrate prejudice as to any of his claims. "In assessing prejudice stemming from the failure to investigate and introduce certain evidence, a court must consider 'all the relevant evidence that the jury would have had before it' had the evidence been introduced, including unfavorable evidence." *Barnes v. Burge*, 372 F. App'x 196, 199 (2d Cir. 2010) (quoting *Wong v. Belmontes,* 130 S.Ct. 383, 386 (2009) (per curiam)). Here, even if Petitioner's trial counsel did as Petitioner claims he should have, *i.e.*, had one of the emergency room doctors testify about the meaning of the hospital records and another EMS technician testify about the accident scene, there

14

is no reason to believe the outcome would have been different as to the charge of "Operating a Motor Vehicle While Under the Influence of Alcohol or Drugs".

A defendant is guilty of common law Driving While Intoxicated ("DWI") if the evidence establishes that the defendant "operate(d) a motor vehicle while in an intoxicated condition." N.Y. Veh. & Traf. Law § 1192(3). The evidence is sufficient to establish that a defendant is intoxicated for purposes of New York Vehicle and Traffic Law § 1192(3) if the evidence shows that the defendant "has voluntarily consumed alcohol to the extent that he is incapable of employing the physical and mental abilities which he is expected to possess in order to operate a vehicle as a reasonable and prudent driver." *People v. Cruz*, 48 N.Y.2d 419, 428 (1979). Most importantly, a defendant may be found guilty of that offense even if the prosecution does not establish that the defendant's blood alcohol level exceeded a certain limit. *People v. Caralho*, 174 AD.2d 687, 688 (2d Dep't 1991) (holding that a defendant may be convicted of common law DWI even if defendant's blood alcohol level does not exceed statutory limit set forth in N.Y. Veh. & Traf. Law § 1192(2)).

Thus, the fact that Petitioner's blood alcohol level may not have exceeded the legal limit, in itself, does not negate the jury's finding that Petitioner was not acting as a reasonable and prudent driver. After the accident, at least five people smelled alcohol on Petitioner's breath: the New York Fire Department emergency medical technicians (T. 54, 77), EMS technician Bojmal (T. 29-30, 32, 34, 36, 41-43, 55-56), Officer Lancaster (T. 82-83), Officer Sheyn (T. 111-12), and the medical staff at the hospital (T. 216-17). In addition, Bojmal testified that Petitioner had slurred speech (T. 36), and Sheyn testified that Petitioner's eyes were bloodshot and watery (T. 111-12). Finally, Petitioner's refusal to submit to a chemical blood test was evidence of consciousness of guilt. (T. 64, 79, 81, 110, 118.)

Furthermore, even assuming Petitioner's blood test showed that his blood alcohol level did not exceed the statutory limit, it nonetheless showed that he tested positive for the presence of alcohol. (*See* Dkt. 17-1 at ECF 70 (stating that 44mg/dL of ethyl alcohol indicates a positive test).)[9] This positive test, even if not at the statutory limit, would have directly contradicted Petitioner's testimony that he did not drink on the night of the accident (T. 159) and that he "do[es] not drink alcohol" (T. 164). Thus, had Petitioner's counsel sought to elicit the testimony that Petitioner urges, *e.g.*, testimony of the emergency room doctor about the meaning of the medical records, it would not have helped Petitioner's defense and more likely would have hurt it. Certainly the testimony of the EMS technicians about the accident scene would have only hurt Petitioner's defense. *Barnes*, 372 F. App'x at 199 ("In assessing prejudice stemming from the failure to investigate and introduce certain evidence, a court must consider 'all the relevant evidence that the jury would have had before it' had the evidence been introduced, including unfavorable evidence.")

Therefore, in light of the overwhelming evidence of Petitioner's "intoxicated condition", which the additional testimony sought by Petitioner would not have rebutted, any failure by counsel was not prejudicial to Petitioner.

## CONCLUSION

For the reasons set forth above, the petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 is denied. Robinson is denied a certificate of appealability, as he has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Middleton*

---

[9] According to the Mayo Clinic, "the presence of ethanol in blood at concentrations above 30 mg/dL (>0.03% or g/dL) is generally accepted as a strong indicator of the use of an alcohol-containing beverage." Mayo Clinic, "Test ID: ALC," (last visited October 2, 2018), https://www.mayomedicallaboratories.com/test-catalog/Clinical+and+Interpretive/8264.

16

*v. Att'ys Gen.,* 396 F.3d 207, 209 (2d Cir. 2005). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 2, 2018
      Brooklyn, New York